**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY,<br><br>                           Plaintiff,<br><br>        v.<br><br>ACCELLION, INC.,<br>                           Defendant. | **Case No. 22-cv-20272-DLG** |

<u>**MOTION OF DEFENDANT ACCELLION, INC. TO DISMISS**</u>
<u>**AMENDED COMPLAINT AND**</u>
<u>**INCORPORATED MEMORANDUM OF LAW**</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Accellion, Inc. ("Accellion") moves to dismiss the Amended Complaint of Plaintiff AIG Specialty Insurance Company ("Plaintiff" or "ASIC") (ECF 16) for failure to state a claim upon which relief can be granted.

## I.      INTRODUCTION

Rather than respond to Accellion's initial Motion to Dismiss (ECF 7), Plaintiff chose to filed an Amended Complaint. There are several reasons why the Court should dismiss this Amended Complaint. The first is the most straightforward: Plaintiff seeks to impose sweeping liability on Accellion based on a zero-day criminal hack of a computer system that Accellion did not own or operate, affecting data that Accellion did not collect or control, concerning persons with whom Accellion has no relationship. The University of Miami (the "Insured") licensed the file-sharing software that Accellion developed to facilitate "large file" transfers—a product called File Transfer Appliance ("FTA")—to store and transfer information that the Insured had collected. (AmCompl. ¶¶ 2, 4.)

The Insured used the FTA pursuant to the License Agreement. (AmCompl. ¶¶ 11-15.) A true and correct copy of the License Agreement is attached to the Notice of Filing (ECF 8) as **Exhibit A**.[1] Under the License Agreement, the customer licenses the FTA software, Accellion delivers the FTA software to the customer and grants a license to the customer, and then each customer is responsible for maintaining and updating its software. Each FTA customer, such as

---

[1] On a motion under Rule 12(b)(6), the Court may properly consider central and undisputed items referenced in (but not attached to) an Amended Complaint when provided by a defendant. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). This Court can consider the License Agreement and the Mandiant Report because they are central to Plaintiff's claims and are undisputed.

2

the Insured, acknowledges it is "*solely responsible and liable for the use of and access to*" the FTA "and for all files and data transmitted, shared, or stored using" the FTA, and agrees it is responsible for deploying critical updates in five days or less. (*Id*. at ¶¶ 3.3, 4 (emphasis added).)

The License Agreement underscores that Accellion will not access "any personally identifiable information about any Customer personnel…or customers (collectively, 'Protected Data')." *Id*. at § 6.2. Insured affirms that it "will be responsible for the Protected Data and for complying with any regulations, laws, or conventions applicable to the Protected Data." *Id*. In the limited circumstances where a "Customer desires Accellion to receive and access any Protected Data, Customer shall first obtain the written approval of an executive officer of Accellion[.]" *Id*. That provision was part of the value proposition for FTA customers: not even Accellion views the data that Insured securely stores or transfers. As a result, however, Accellion does not know the types of documents or information the Insured transmitted or stored with the FTA—or whose personal information might have been compromised in the Attacks.

As alleged in the Amended Complaint, in December 2020 and January 2021, sophisticated cybercriminals exploited previously unknown vulnerabilities in the FTA (the "Attacks"). (AmCompl. ¶ 3.) The claims arise from a zero-day criminal hack. (*Id*. ¶¶ 3, 5, 52.) In describing the Attacks, the Amended Complaint primarily relies on a report prepared by FireEye Mandiant, a leading cybersecurity forensics firm that Accellion retained to investigate the Attacks and to review the FTA for any other potential security vulnerabilities. A true and correct copy of the Mandiant Report is attached to the Notice of Filing (ECF 8) as **Exhibit B**. In summary, Mandiant determined effective patches had been made available for all Accellion FTA vulnerabilities known to have been exploited by threat actors in December 2020 and January 2021. (AmCompl. ¶¶ 46, 50.)  As soon as Accellion learned of the Attacks, it acted swiftly to support its customers,

including by releasing patches for the vulnerabilities within days of discovery. (*Id.* ¶¶ 29-51.) As the Mandiant Report (Ex. B) states at page 8:

> As reflected in the Timeline section, Accellion issued a patch addressing the vulnerabilities associated with the December Exploit on December 20, 2020 (four days after it started investigating anomalous activity associated with the exploit), and a patch addressing the vulnerabilities associated with the January Exploit on January 25, 2021 (three days after it started investigating anomalous activity associated with the exploit, having advised all FTA customers to shut down their FTA instances in the interim).
>
> Accellion asked Mandiant to confirm that the patches successfully closed these Exploited Vulnerabilities, and that no other vulnerabilities were exploited as part of the attack activity. Mandiant's analysis confirmed both points.

ASIC's claims against Accellion are significantly flawed because ASIC has not, and apparently cannot, identify when the criminals attacked the Insured's FTA. ASIC refers only vaguely to a breach on an undefined date: "Prior to Accellion's March 1, 2021 patching of the additional vulnerabilities, threat actors stole protected health information and other confidential information from Insured." (AmCompl. ¶ 52).[2] Further, the Amended Complaint does not identify any unreasonable Accellion security practices that purportedly caused the Attacks, nor does ASIC allege the cause of the Attacks. ASIC acknowledges Accellion informed the Insured of the first round of Attacks in December 2020 (AmCompl. ¶ 30) and of the second, separate round of Attacks in January 2021. (*Id.* ¶ 36.)

Moreover, Accellion does not owe a duty to provide perfect security, either arising under the License Agreement or otherwise. (Ex. A at § 7.4.) The Insured acknowledged this point when

---

[2] As reflected on page 8 of the Mandiant Report, the FTA customers, not Accellion, would initially learn they had been attacked via the anomaly detector, which would prompt the customer to contact Accellion. In other words, only after an FTA customer notified Accellion of the anomaly detector would Accellion investigate and determine that criminals were attacking. This point underscores the later discussion that FTA customers have total control and access to their underlying data and its transmission. Accellion has no such access. *See infra* at pages *-*.

it agreed to the License Agreement, which disclaims any warranty that the FTA will be free of errors or interruption. (*Id*.)  Courts have not recognized such a duty in data breach circumstances. Several policy considerations strongly weigh against recognizing such a duty here. Imposing a duty here on Accellion would essentially require software companies to guarantee security to anyone who happens to use the FTA. The result would be to expose companies such as Accellion to a boundless risk of enterprise-threatening lawsuits, in essence creating strict liability for software licensors in the wake of zero-day criminal hacks. This is not the law, nor should it be.

Imposing a tort duty on Accellion here would also undermine Accellion's contracts, which set forth the respective responsibilities of Accellion and its customers. ASIC's theories would make an end-run around the License Agreement and impose on Accellion an amorphous duty to protect its business customers, such as the Insured, to an even greater degree than Accellion's customers must protect themselves. The Eleventh Circuit declines to impose a duty in such circumstances. *See, e.g., Silverpop Systems Inc. v. Leading Market Technologies*, 641 F.App'x 849 (11th Cir. 2016) (per curiam). It is not possible to "rid [a] complex system of all risk of software coding errors" or "eliminate all future breaches or leaks." *Adkins v. Facebook, Inc.*, No. C 18-05982 WHA, 2021 WL 1817047, at *2 (N.D. Cal. May 6, 2021).

Plaintiff's counts all fail as a matter of law. The Court should thus dismiss the Amended Complaint in its entirety and—because this Amended Complaint presents no credible facts that ASIC can allege to salvage its claims for damages—without leave to amend.

## II.   <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading withstands

a motion to dismiss only if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). This pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

Additionally, where a cause of action asserts a misrepresentation, it must satisfy Federal Rule of Civil Procedure 9(b). *See U.S. ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309-10 (11th Cir. 2002); *Gayou v. Celebrity Cruises, Inc.*, 2012 WL 2049431, at *3 (S.D. Fla. June 5, 2012). Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) is only satisfied if a plaintiff pleads: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016) (citations omitted).

## III.    PLAINTIFF INADEQUATELY PLEADS BREACH OF CONTRACT

Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914

(11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So.2d 1338, 1340 (Fla. Dist. Ct. App. 1992)). A complaint that fails to contain necessary factual information to support the claims must be dismissed. *See Whitney Nat. Bank v. SDC Communities, Inc.*, No. 809CV01788EAKTBM, 2010 WL 1270264, at *3 (M.D. Fla. Apr. 1, 2010) (dismissing claims for breach of contract because plaintiff failed to allege sufficient facts to support its claims).

The Amended Complaint does not properly plead that Accellion materially breached the License Agreement. The purported breach that ASIC has pleaded is criminals' access to Insured's confidential information that Accellion had supposedly "acquired." (AmCompl. ¶¶ 57-59.) However, the Amended Complaint mischaracterizes the Insured's use of the FTA. The Insured "obtained" the FTA from Accellion pursuant to the License Agreement.[3] As a result, the Insured— not Accellion—licensed and operated the FTA that the criminals attacked; Accellion had no possession or control of the FTA. Section 3.1 (License Grant) of the License Agreement provided the Insured was to "install and use" the FTA and to "use, access, and for [the FTA] not hosted by Accellion, copy the Server Software…." Thus, under the License Agreement, Accellion never acquired the Insured's information because the Insured retained that information on the FTA that the Insured "obtained." In other words, the whole point of the FTA was to allow the customer to transfer files internally (for itself) or externally (to third parties designated by the customer). Accellion did not transfer or receive those files or the information therein.

The License Agreement makes this point in several provisions. For example, Section 3.3 provides in part: "Customer is solely responsible and liable for the use of and access to the [FTA]

---

[3] In its original Complaint (ECF 1), Plaintiff alleged the Insured "purchased" the FTA from Accellion pursuant to the License Agreement. (Compl. ¶ 29.) The Amended Complaint changes "purchased" in that paragraph to "obtained the 'right[] to use Accellion software,'" (AmCompl. ¶ 55), while later stating the Insured "purchased a license." (AmCompl. ¶ 66).

by Designated Users and for all files and data transmitted, shared, or stored using the [FTA]."
Additionally, Section 4, "Maintenance Support Services," provides that the Insured "shall provide
Accellion access to the [FTA software] to install" updates. The FTA was at the Insured's site, and
operated and controlled by the Insured, not Accellion. Accellion could only update the FTA if the
Insured provided "access."

Turning to the Attacks, page 6 of the Mandiant Report illustrates Accellion's non-existent
relationship with Insured's information: "The uploading of the DEWMODE web shell to the file
location where the attacker placed it had the effect (likely unanticipated by and unknown to the
attacker) of tripping the built-in anomaly detector included in the FTA software. Once the anomaly
detector is tripped, **it generates an email alert to the customer (specifically to the admin email
account designated by the customer), advising the customer to contact Accellion for support**.
As a result, any FTA customer affected by the December Exploit likely was sent such an email –
which, per Accellion, is how the December Exploit came to its attention (see above Timeline)."
(Emphasis added.) As the Mandiant Report states, the attack occurred on the FTA at the customer's
site, which then generated an email alert to the customer. The customer then had the obligation to
inform Accellion that the customer had been attacked.

Contrary to ASIC's allegations, and as laid bare by Section 6.2 of the License Agreement,
Accellion did not access, control or transmit, the Insured's allegedly exfiltrated data. Rather, the
Insured had exclusive control of, and exclusive responsibility for, protection of the data:

> Section 6.2 Customer Protected Data. Customer acknowledges that Accellion does not
> need or require access to any files or attachments stored or transmitted with the Accellion
> Solution or any personally identifiable information about any Customer personnel or
> customers…If Customer desires Accellion to receive and access any Protected Data,
> Customer shall first obtain the written approval of an executive officer of
> Accellion…Customer will be responsible for the Protected Data and for complying with
> any regulations, laws, or conventions applicable to the Protected Data.

Under no circumstances was the Insured's FTA data ever stored on or transferred through systems that Accellion owned or operated. Nor would Accellion otherwise ever access the customer's data as part of the operation of the FTA. Indeed, this was part of the value proposition of the FTA—customers retained control over their sensitive data and information, and even Accellion did not know what that data was or ever access it. Because Accellion never possessed the Insured's "confidential information" (AmCompl. ¶ 31) or its Protected Data, Accellion could not have breached the confidentiality provision of the License Agreement.

To hold Accellion responsible for alleged criminal exfiltration of such data would therefore run counter to the express language of Section 6.2, and have the pernicious effect of rendering Accellion an insurer of the very content and transmission over which it had no control. In this vein, the Insured purchased insurance from ASIC to offset liability it understood the License Agreement did not cover, including for the potential exfiltration of confidential information. ASIC, which stands in the shoes of its Insured in this subrogation lawsuit, should not be allowed to circumvent the License Agreement and unfairly reallocate risk that its Insured and Accellion bargained for at arm's length. The License Agreement and the Mandiant Report are therefore in accord: Accellion did not breach "the Confidentiality Provision of the License Agreement by failing to maintain in confidence Insured's confidential information that it acquired from Insured (*sic*)" (AmCompl. ¶ 60), because Accellion did not have such information.

Further, the Amended Complaint is devoid of allegations the Insured obtained "the written approval of an executive officer of Accellion" for Accellion to access any files or attachments stored or transmitted with the FTA. (Ex. A at § 6.2.) This simple omission is fatal to the breach of

contract allegation because it demonstrates that Accellion never acquired the Insured's "Confidential Information" as ASIC alleges in Paragraph 59 of the Amended Complaint.

Finally, and perhaps ironically, Paragraph 53 of the Amended Complaint concedes ASIC is suing Accellion based on "an assignment," which the License Agreement proscribes at Section 11.2 ("Neither Party may assign this Agreement without the prior written consent of the other Party..." absent a qualifying reorganization, *e.g.*, merger). Thus, the Insured breached the License Agreement by assigning its rights without complying with Section 11.2. This is dispositive of ASIC's breach of contract claim, as well as the entire action.

## IV.    ASIC DID NOT PROPERLY PLEAD A MISREPRESENTATION

Negligence claims under Florida law involve four elements: duty, breach, causation, and damages. *Virgilio v. Ryland Grp.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (citation omitted). "[T]he existence of a duty under [Florida] negligence law is … ultimately a question of law for the court rather than a jury." *Williams v. Davis*, 974 So.2d 1052, 1056 n.2 (Fla. 2007) (alterations added; citation omitted). The elements of negligent misrepresentation are: "(1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So.3d 502, 505 (Fla. Dist. Ct. App. 2017).

Negligent misrepresentation is subject to the heightened pleading standard of Rule 9(b). *See Gayou*, 2012 WL 2049431, at *7. This requires a plaintiff to establish "the 'who, what, when, where, and how' of the fraud." *Ceithaml v. Celebrity Cruises, Inc.,* 207 F.Supp.3d 1345, 1353 (S.D. Fla. 2016), citing *Garfield v. NDC Health Corp.*, 466 F. 3d 1255, 1262 (11th Cir. 2006)).

It appears that ASIC bases the "who, what, when, where, and how" of the fraud in Count II solely on an alleged misrepresentation as follows: (1) Accellion announced on January 11 that, after the December 2020 Attacks, "Accellion resolved the vulnerability and released a patch within 72 hours to the less than 50 customers affected" (AmCompl. ¶ 34); (2) later in January, Accellion issued a security alert to Insured that its FTA may be vulnerable with an instruction to shut down the FTA (AmCompl. ¶ 36); (3) on February 1, Accellion stated the December 2020 "incident was the beginning of a concerted cyberattack on the Accellion FTA product that continued into January 2021. Accellion identified additional exploits in the ensuing weeks and rapidly developed and released patches to close each vulnerability" (AmCompl. ¶ 39); and (4) thus, the January 11 alert must have been a "misrepresentation" because there were criminal attacks after January 11, 2021. The key flaw in ASIC's construction is its misinterpretation of the January 11 alert as stating that the FTA was now somehow invulnerable, secure from all possible attacks.

In essence, the correct way to view the allegations is as follows: (a) Accellion built the FTA and made no representations as to its security; (b) Accellion sold the FTA to Insured, who was responsible for securing its FTA and confidential information; (c) in December 2020, Accellion learned other customers' FTAs were victimized by criminal attacks; (d) Accellion worked to correct vulnerabilities in the FTA for all of its customers from the December Attack, and, on January 11, alerted its customers that it had fixed the source of the December Attack;  (e) later in January, criminals attacked the FTA in a different manner; (f) Accellion worked to correct the FTA's vulnerabilities from the new January Attacks and in February alerted its customers that it had fixed the source of the January Attack; and (g) on behalf of Insured, ASIC sued Accellion because Insured purportedly believed that, after the January 11 alert, its FTA was secure from all

attacks. This construction is facially absurd and, if entertained, would disincentivize companies such as Accellion from diligently and transparently working with customers to solve problems.

Moreover, ASIC also failed to adequately plead "reliance" on Accellion's statements on January 11, 2021. While as a result of the January 11 alert, Insured may have "continued to use the FTA software to transfer its confidential information and files in January 2021" (*see* AmCompl. ¶¶ 78), the January 11 alert quoted in the Amended Complaint does not represent that the FTA is "secure," (*see* AmCompl. ¶ 75) let alone secure from all possible criminal attacks. Rather, as alleged in Paragraph 75, the January 11 alert states only Accellion had "resolved the vulnerability" of December 2020, a "distinct" exploit as explained in the Mandiant Report. Therefore, Insured's continued use of its FTA could not have been in "reliance" on Accellion's January 11 representation "that its FTA software was secure," because the January 11 alert never made such a representation. (AmCompl. ¶ 75).

Similarly, in Paragraph 78, ASIC alleges that "in reliance on Accellion's statements regarding the FTA software, including its FIPS 140-2 compliance, the resolution of the vulnerabilities identified in December 2020, and the security of the FTA on a go-forward basis, and Accellion's omission of the above-referenced material facts, Insured continued to use the FTA software to transfer its confidential information and files in January 2021." Because the Amended Complaint fails to allege the date of the alleged exfiltration of Insured's data, how can one determine whether the Insured's purported "continuing" reliance is reasonable? Further, who specifically relied? Did anyone from the Insured actually read the notices that Accellion sent? The Amended Complaint is silent on these crucial "'who, what, when, where, and how" issues.

Finally, Paragraph 66 of the Amended Complaint cherry-picks Section 7.2 of the License Agreement, which "warrants to Customer that, to the best of Accellion's knowledge *as of the date*

*of delivery* [about August 23, 2018], the [FTA] will be free from any viruses, spyware, trojans, or disabling or malicious code, provided that Server Software includes disabling mechanisms that prevent access to the Server Software following expiration of the License Term." (Emphasis added.) Contrary to a perpetual warranty, Section 7.2 cabins the warranty to "the date of delivery." Eschewing any doubt on this issue, Section 7.4 of the License Agreement clarifies: "ACCELLION DOES NOT WARRANT THAT THE USE OF THE [FTA] WILL BE UNINERRUPTED OR ERROR FREE OR THAT ALL NONMATERIAL DEFICIENCIES OR ERRORS ARE CAPABLE OF BEING CORRECTED." Given this clear language, holding Accellion liable in the wake of a sophisticated zero-day criminal cyber-attack would turn the law on its head.

There are several other reasons why ASIC's negligent misrepresentation claim fails.

*The Contract Controls*: A contract that defines the duties owed between parties governs the duties owed, with no independent duty exception; thus, parties must exclusively seek contract law remedies. *Silverpop, supra,* 641 F.App'x at 850–51.

*Economic loss*: Florida law generally does not obligate parties to avoid causing economic loss. *Virgilio*, 680 F.3d at 1339–40. "[T]o proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim." *Tank Tech, Inc. v. Valley Tank Testing, LLC*, 244 So.3d 383, 393 (Fla. Dist. Ct. App. 2018) (alteration added; citing *Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 531 (Fla. Dist. Ct. App. 1999); (other citations omitted). Courts faced with these claims must "examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law." *Monroe*, 746 So.2d at 534 n.6. "As the majority recognizes, plaintiffs whose cases fall outside of the economic loss rule must still satisfy 'the traditional negligence principles of duty, breach, and

proximate cause.' … A service provider's mere failure to exercise reasonable care in performing a service contract does not render it liable in tort to every party who loses revenue or incurs additional expense. The plaintiff still must demonstrate an independent duty to protect that plaintiff's purely economic interests." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 546 (Fla. 2004) (Cantero, J., concurring) (citations omitted); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm §§ 1 cmt. b, 3 cmt. a (Am. L. Inst. 2020); *see also id.* § 3 reporter's notes a and b (observing Florida follows the majority of jurisdictions that distinguish between the economic loss rule and the general lack of a duty to avoid causing economic harm).

When a negligence claim alleges only economic loss, "the duty element . . . serves as an important barrier to over-extension of liability." *Virgilio*, 680 F.3d at 1339. Courts in Florida recognize the duty requirement precludes most negligence claims predicated on economic harm alone. *See, e.g., Tank Tech*, 244 So.3d at 393–94; *Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So.3d 1092, 1094–95 (Fla. Dist. Ct. App. 2015); *Insight Secs., Inc. v. Deutsche Bank Tr. Co. Ams.*, No. 20-23864-Civ, 2021 WL 3473763, at *3–4 (S.D. Fla. Aug. 6, 2021). Florida courts entertain negligent misrepresentation claims for economic harm "only when specific circumstances have warranted a more liberal judicial rule and an expanded duty of care." *Lucarelli Pizza & Deli*, 173 So. 3d at 1094 (citations omitted). Under Florida law, a duty can arise from one of four sources: (1) statutes and regulations; (2) judicial interpretations of legislation; (3) judicial decisions; or (4) the facts of a particular case. *See Insight Secs.*, 2021 WL 3473763, at *3 (citation omitted). ASIC fails to allege any specific statute, regulation, or decision that would impose a duty of care on entities such as Accellion that sell or license software. The question here is whether ASIC alleged facts that demonstrate "some sort of link between the parties or some other extraordinary circumstance that justifies recognition of" a duty. *Tank Tech*, 244 So.3d at 393

(citations omitted).   The answer is "no." There is nothing "extraordinary" about Insured's relationship with Accellion. Insured is a business that licensed Accellion's FTA. Insured is a party to a contract that defines its rights as an owner and a user of the FTA, and restricts Insured's ability to pursue tort claims. "If two parties have a contract, the argument for limiting tort claims between them is at its most powerful." Restatement (Third) of Torts: Liab. for Econ. Harm § 3 cmt. a (Am. L. Inst. 2020). The Amended Complaint offers no compelling reason why tort law, rather than contract law, should govern this relationship. Although the Complaint points to Accellion's marketing efforts (AmCompl. ¶ 1), marketing is not generally a reason to impose a duty to protect another's economic interests. *See Virgilio*, 680 F.3d at 1340. ASIC does not plausibly allege Accellion "fits into a special professional category where the standard of care includes a duty to protect the economic interests of clients or affected parties." *Lucarelli Pizza & Deli*, 173 So.3d at 1095. The License Agreement confirms Insured assumed the risk of the events alleged in the Amended Complaint. "[T]he existence of a contractual relationship is a good reason not to create a negligence cause of action shifting economic risks that the parties could have shifted through bargaining." *Monroe*, 746 So.2d at 537 (citations omitted). Courts applying Florida law do not impose tort duties on software firms like Accellion when the license agreements with businesses contain risk-allocating provisions. *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 948–50 (11th Cir. 2014); *Paszamant v. Ret. Accts., Inc.*, 776 So.2d 1049, 1053 (Fla. Dist. Ct. App. 2001).

The Eleventh Circuit's decision in *Silverpop, supra*, was a breach-of-personal-information case that gave dispositive weight to the nature of the contractual relationship when both parties were businesses. Pursuant to their contract, Silverpop granted use of an email marketing tool to LMT that retained a list of email addresses for LMT to access to distribute marketing

communications to customers. *Id*. In 2010, an unauthorized party gained access to Silverpop's systems and obtained LMT's stored email information. *Id*.

In deciding whether Georgia's economic loss rule barred LMT's negligence claim, the court applied the contractual economic loss rule with the independent duty exception. *Id*. at 853. The court concluded that any duty to protect the email list at issue arose under the terms of the parties' contract, which included provisions governing the protection of confidential information. *Id*. The existence of a well-defined contractual relationship between the parties, as is the situation here, led the court to channel the claims towards the contract terms. *Id*. The court held that, when a contract supplants the independent, non-contractual common law duty of care, the economic loss defense operates as a complete shield against tort liability for purely economic damages. *Id*.

Count II fails as a matter of law because the License Agreement "adequately covered or expressly contradicted" the subject of Accellion's alleged affirmative misrepresentation. *B & G Aventura, LLC v. G-Site Ltd. Partnership*, 97 So.3d 308, 309–10 (Fla. Dist. Ct. App. 2012) (affirming decision for defendant on plaintiff's fraudulent inducement claim because the parties' contract included specific provisions disclaiming oral representations, and confined the parties' obligations to those set forth in the contract) (quoting *Hillcrest Pac. Corp. v. Yamamura*, 727 So.2d 1053, 1056 (Fla. Dist. Ct. App. 1999)). The express terms of the License Agreement conclusively belie ASIC's claim that Accellion's affirmative misrepresentations about the FTA induced its Insured to enter into the contract. *See Hillcrest Pac. Corp.*, 727 So.2d at 1056 (fraudulent inducement claim was properly dismissed where complaint's allegation that defendant misrepresented the price was "fatally inconsistent" with the agreement that stated the price).

In short, the risk allocation provisions in the License Agreement merit judicial respect under Florida law. This Court should decline ASIC's invitation to rewrite the License Agreement under the guise of a negligent misrepresentation claim and should dismiss Count II.

V.      **ASIC'S PURPORTED CLAIM UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") MUST BE DISMISSED FOR FAILURE TO ALLEGE ACTUAL DAMAGES**

ASIC did little in its Amended Complaint to overcome the fatal flaw in its FDUTPA claim. As Accellion noted in its original Motion to Dismiss, ASIC did not properly plead a FDUTPA claim because ASIC has not pled, and apparently cannot plead, "actual damages."

To state a claim under FDUTPA, Fla. Stat. § 501.201, *et seq.*, a plaintiff must allege: (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages. *See, e.g., Morgan v. Enterprise Leasing Company of Florida, LLC*, 2021 WL 4709787 at *4 (S.D. Fla. Oct. 8, 2021). A complaint that fails to allege "actual damages" fails to allege a recoverable loss under FDUTPA, and therefore fails to state a cause of action. *Id.* at *5 (granting motion to dismiss FDUTPA claim because "[b]y failing to state a recoverable loss under FDUTPA, the Amended Complaint fails to state a claim of action under FDUTPA"); *Franklin Law Firm, P.A. v. Stacey*, 2020 WL 10503003 at *2 (M.D. Fla. May 7, 2020) (granting motion to dismiss FDUTPA claim based on the court's finding that the claim "fail[ed] as a matter of law because it lacks well-pleaded allegations of actual damages"). "Actual damages" is "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'"[4] *Morgan*, 2021 WL 4709787 at *4

---

[4] There is one exception to this rule: when the product or service is rendered valueless as a result of the defect, the purchase price is the appropriate measure of actual damages. *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984).

(citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)); *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010).

Critically, under FDUTPA, "'actual damages' [do] not include special or consequential damages." *Rodriguez*, 38 So. 3d at 180; *Morgan*, 2021 WL 4709787 at *4. Damages that do not flow directly from the breach of the specific terms of the contract upon which a plaintiff sues are consequential in nature. *See Validsa, Inc. v. PDVSA Services, Inc.*, 2010 WL 11506050 at *2 (S.D. Fla. Jan. 8, 2010). "Indirect damages that relate to 'losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach [,]'" are consequential damages. *Id.* at *2 (citing *Hardwick Props. v. Newbern*, 711 So. 2d 35, 40 (Fla. Dist. Ct. App. 1998)).

*Rodriguez* is instructive. There, the plaintiff brought a FDUTPA claim to recover her down payment and related loan payments after a boat that she purchased from defendant caught fire and sank five days after plaintiff purchased it. *Rodriguez*, 38 So. 3d at 179. The court held that because the "subject of the consumer transaction" was the plaintiff's purchase of the boat, the proper measure of the plaintiff's "actual damages" under FDUTPA would be "the difference between the market value of the jet-boat as delivered and its market value as it should have been delivered [,]" rather than "the down payment and loan payments." *Id.* (citing *Smith*, 872 So. 2d at 994).

The Eleventh Circuit's decision in *Silverpop, supra,* also demonstrates ASIC's alleged damages are consequential and not "actual damages." The Eleventh Circuit applied and contrasted the Second Circuit's definitions of direct v. consequential damages – "damages that compensate for the 'value of the very performance promised'" (direct) and "damages that seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach" (consequential). *Id.* at 856. The Eleventh Circuit held that

18

LMT's damages were "best characterized as consequential," because, while it was necessary for LMT to provide Silverpop with its mailing list for marketing, safe storage of the list was not the purpose of the agreement between LMT and Silverpop. *Id.* The court held that, "considering the purpose of the parties' agreement, the damages LMT seeks are not the type that 'arise naturally and from the usual course of things.' LMT's damages are consequential rather than direct." *Id.*

Similarly, in its FDUTPA claim, ASIC seeks only consequential damages. ASIC's alleged damages do not arise from Insured's "right[] to use Accellion software… [and] Maintenance Support Services." AmCompl. ¶¶ 11, 14. Rather, ASIC alleges it "incurred damages to remediate the effects of the breach and loss of confidential information," (*id.* ¶ 5), and "through its use of third party vendors." *Id.* ¶ 52. Like those of LMT in *Silverpop*, ASIC's purported damages stem from the Insured's attempts to remediate a data breach, and are thus textbook consequential damages. *See Validsa*, 2010 WL 11506050 at *2 (consequential damages are "indirect damages that relate to 'losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach [,]'") (citations omitted).

While ASIC alleges that Section 6.1 demonstrates that "Accellion … agreed to maintain the confidentiality of this information," (AmCompl. ¶ 15), Section 6.1 is a mutual covenant between the parties to maintain the confidentiality of *each other's* information. In fact, Section 6.1 imposes greater obligations upon *the Insured* than on Accellion; the only specific example of confidential information that section provides is that "[t]he results of any performance, penetration and/or benchmark tests on the Accellion Solution shall be the Confidential Information of Accellion." Regardless of the party to which Section 6.1 would apply with greater force, Section 6.1 certainly cannot be read to modify the expressly stated subject and purpose of the License Agreement: Accellion's providing the Insured with a license to use the FTA and support services.

ASIC attempts to distract from the absence of "actual damages" by alleging that Accellion's software was "valueless, as it was not secure and it did not offer the security that Accellion represented that it did, including compliance with FIPS 140-2 Level 2." AmCompl. ¶ 88. As demonstrated above, the subject of the License Agreement was the Insured's use of and access to Accellion's file transfer software, not Accellion's provision of cybersecurity services. Ex. A at § 3.1 ("Accellion hereby grants to Customer during the License Term, a non-exclusive, non-transferable and non-sublicensable license to: (a) install and use the Client Software…and (b) use, access, and…copy the Server Software). The License Agreement makes no mention of FIPS 140-2 Level 2, or any other, cybersecurity certification. *See* Ex. A. When exhibits to a complaint contradict the general and conclusory allegations of the pleading, the exhibits govern. *Medical Imaging Solutions Group, Inc. v. Hanover Ins. Co.,* 2018 WL 8311416 at *2 (S.D. Fla. Sept. 21, 2018)(Gayles, J.); *Llauro v. Tony,* 470 F. Supp. 3d 1300, 1314 (S.D. Fla. 2020)(Gayles, J.).

ASIC's allegation that its costs for remediating a data breach constitute "actual damages" evidences its fundamental misunderstanding of the License Agreement and FDUTPA. Since the Amended Complaint lacks *any* allegations as to ASIC's actual damages, ASIC fails to allege a recoverable loss under FDUTPA. Accordingly, the Court must dismiss Count III.

## **CONCLUSION**

ASIC's claims fail as a matter of law. Accellion requests the Court dismiss ASIC's Complaint, with prejudice, and grant Accellion such further relief as the Court deems appropriate.

Respectfully submitted,

**BILZIN SUMBERG BAENA
PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone: 305-374-7580
Facsimile: 305-374-7593

By: *Mitchell E. Widom*
Mitchell E. Widom, Esq.
Florida Bar No. 473911
mwidom@bilzin.com
Kelly Ruane Melchiondo, Esq.
Florida Bar No. 582603
Kmelchiondo@bilzin.com
Benjamin Mitchel, Esq.
Florida Bar No. 1018918
bmitchel@bilzin.com
eservice@bilzin.com
etrujillo@bilzin.com

*Attorneys for Defendant, Accellion, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 7, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Mitchell E. Widom*
Mitchell E. Widom

21