**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY, )<br><br>　　　　　　　PLAINTIFF, )<br><br>VS. )<br><br>ACCELLION, INC. )<br><br>　　　　　　　DEFENDANT. )<br> ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 22-cv-20272-DLG<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT**

Plaintiff, AIG Specialty Insurance Company ("ASIC"), as subrogee and assignee, complains of Accellion, Inc. ("Accellion") and in support thereof, alleges as follows:

**INTRODUCTION**

1.　　Accellion is a software company that provides file transfer software and services to customers. Accellion markets its company and software as having "protected more than 25 million end users at more than 3,000 global corporations and government agencies." [1]

2.　　Accellion developed and sold licenses for a software called File Transfer Appliance ("FTA"). At all times relevant to this complaint, Accellion marketed its FTA as a secure method of transferring files.

3.　　On December 16, 2020 and January 20, 2021, threat actors targeted Accellion's FTA software as a means of committing an unauthorized access and theft of confidential information. The December 2020 compromise exploited at least two critical vulnerabilities, while

---

[1] *See* https://www.kiteworks.com/company/security-updates/accellion-provides-update-to-recent-fta-security-incident/ (last visited Jan. 18, 2022).

the January 20, 2021 compromise exploited at least two critical vulnerabilities. Thereafter, Accellion's own investigation identified two additional vulnerabilities not yet exploited by the threat actors. Accellion's forensic investigators categorized these vulnerabilities as "medium severity" and "high severity" in a March 2021 report.

4.     From at least August 23, 2018 through January 2021, the University of Miami ("Insured") used Accellion's FTA software to transfer large files, including files containing confidential information and protected health information.

5.     As a result of the January 2021 breach of Accellion's software, the threat actor accessed and stole Insured's sensitive and confidential information. Insured incurred damages to remediate the effects of the breach and loss of confidential information, including protected health information.

## THE PARTIES, JURISDICTION, AND VENUE

6.     ASIC is incorporated under Illinois law and maintains its principal place of business in New York.

7.     Accellion is a corporation organized and existing under the laws of Delaware and maintains its principal place of business in California.

8.     This Court has diversity jurisdiction pursuant 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 (exclusive of interest and costs) and the matter involves a dispute between citizens of different states, as ASIC is a citizen of Illinois and New York, and Accellion is a citizen of Delaware and California.

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

10.     This Court has personal jurisdiction over Accellion because upon information and belief, Accellion provided software products and services to customers in Florida and contracted

to litigate any disputes arising out of its License Agreement with Insured in Florida.

## FACTS COMMON TO ALL ALLEGATIONS

### A.   INSURED'S LICENSE AGREEMENT WITH ACCELLION

11.     Insured entered into an Accellion Solutions License Agreement ("License Agreement") on or about August 23, 2018 for the "right[] to use Accellion software". Pursuant to the License Agreement, Accellion granted Insured "a non-exclusive, non-transferable and non-sublicenseable license to: (a) install and use the [FTA] software on supported environments for up to the number of Designated Users; and (b) use, access, and for Accellion Solutions not hosted by Accellion, copy the Server Software on supported environments for up to the number of copies identified on the Order for Customer's internal business purposes."

12.     As explained in the License Agreement, Accellion owns the FTA software. The "Ownership" provision of the license agreement provided, "All right, title, and interest … in and to the Accellion Solution, including any and all modifications, enhancements, derivative works, Updates and Releases, are the sole and exclusive property of Accellion and its licensors."

13.     Accellion also prohibited Insured from making any alterations to its FTA software: "The Accellion Solution may not be modified, disclosed, reverse-engineered, disassembled, or decompiled…"

14.     In addition to the FTA license, Accellion provided Maintenance Support Services, which included providing software updates to the FTA. To facilitate Accellion's maintenance of its FTA, Accellion required Insured to provide Accellion access to install updates if required by Accellion and to agree to deploy critical software updates as identified by Accellion. In connection with Accellion's provision of Maintenance Support Services, Accellion retained access to Insured's FTA software, which Accellion accessed through its Management server.

15.     Per the Maintenance Support Policy, which Accellion incorporated into its License Agreement, Accellion agreed that for critical errors, "Accellion shall use reasonable efforts to resolve the critical error and/or provide a work around within forty-eight (48) hours from initial report of problem." Accellion further agreed that it "shall provide status reviews to Licensee every eight (8) hours until such error is resolved."

16.     Accellion appreciated the confidential nature of the documents transmitted through its FTA software and agreed to maintain the confidentiality of this information. Under Section 6.1 of the License Agreement, Accellion agreed "to maintain in confidence and not disclose any Confidential Information acquired directly or indirectly from" Insured. (License Agreement, § 6.1). The License Agreement provided that Confidential Information "shall include, but is not limited to, matters of a technical, financial, commercial, business, or other proprietary nature."

**B.     THE FUNCTIONALITY OF THE ACCELLION SOFTWARE**

17.     Accellion's software operated as a "black box" in that customers would place files into the FTA software, but lacked the ability to access the uploaded files in Accellion's software or to view which of their documents were within Accellion's software at any given point in time.

18.     After Accellion's customers deposited files into the FTA software, the software encrypted the files and transmitted those files to the recipients. Recipients set up their own username and password to access the documents transmitted by Accellion through its FTA software.

19.     Accellion maintained logs of the files its customers sent through its FTA software. Insured could not access these logs unless Accellion provided those logs.

20.     Accellion managed all third-party access to its software, as the software maintained all recipients' usernames and passwords and controlled their access to the documents transmitted through Accellion's software.

21.     Accellion's customers lacked the ability to make any modifications to the software they licensed.

22.     Accellion published updates to the software. Thereafter, it either required customers to install the updates Accellion provided and/or to provide Accellion with access to their systems to allow Accellion to perform the necessary maintenance and install any updates on the software.

23.     Accellion maintained a "Management server" through which it could access the FTA systems used by its licensees.

24.     Accellion obtained a National Institute of Standards and Technology ("NIST") Federal Information Process Standards Publication 140 Level 2 certification ("FIPS 140-2") for its FTA. FIPS 140-2 is a cryptographic model for computer applications and environments that must be met with respect to the transfer and storage of certain sensitive government and health information.

25.     At all times relevant to this complaint, NIST required products labeled as compliant with FIPS 140-2 to not only comply with the FIPS 140-2 model at the time of certification, but to continue to use the validated version of the cryptographic model throughout its life-cycle.

26.     Accellion widely advertised its FTA software as FIPS 140-2-compliant. It issued alerts advising customers that its FTA software "has achieved FIPS 140 Level 2 certification … This certifies that all file transfer operations through the [FTA] are being performed in a highly secure and safe environment." Accellion further advised that "FIPS 140 Level 2 certification covers both the hardware and software aspects of the Accellion Appliance and ensures that not only the software/firmware offers best-in-class security but also the physical security conforms to the highest possible security standards."

27.    Insured reviewed and relied upon Accellion's representations regarding its FTA software as FIPS 140-2-compliant in determining the scope of Insured's use of the software at all times relevant to this complaint.

28.    Prior to December 2020, Accellion determined that FTA was near "end-of-life" and began to transfer certain customers to its newer Kiteworks solution. Nonetheless, Accellion continued to provide, support, and maintain its FTA software. However, as late as January 2021, Insured was unaware that Accellion had determined the product was near "end-of-life" and was continuing to use the product as part of its data security program.

29.    Despite Accellion's marketing of its FTA software as FIPS 140-2-compliant and its provision and support of its FTA software for customers to send sensitive information, the software had at least six significant vulnerabilities that made the software unsuitable for its intended use and for the uses for which Accellion had marketed the software. This included four critical vulnerabilities that were exploited by threat actors (SQL Injection (CVE-2021-27101), OS Command Execution (CVE-2021-27104), Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102)).

### C.    THE DECEMBER 2020 BREACH OF ACCELLION'S FTA SOFTWARE

30.    On or around December 16, 2020, threat actors targeted Accellion's FTA as a means of accessing confidential information.[2] From December 16, 2020 to December 20, 2020, Accellion reportedly investigated and identified vulnerabilities within its FTA software.[3] Upon information and belief based on the information shared in the Mandiant report posted by Accellion

---

[2] *See* https://www.kiteworks.com/sites/default/files/trust-center/acclleion-fta-attack-mandiant-report-full.pdf (last visited Jan. 18, 2022). Plaintiff does not concede the accuracy of all information in this report, but merely provides this reference to support the facts alleged.

[3] *See* https://www.kiteworks.com/sites/default/files/trust-center/acclleion-fta-attack-mandiant-report-full.pdf (last visited Jan. 18, 2022).

in March 2021 ("Mandiant Report"), Accellion limited its December 2020 investigation to the specific vulnerabilities used by the threat actors in December 2020. It did not perform a comprehensive evaluation of the FTA software to determine if there were any other vulnerabilities subject to exploitation by the threat actors. Had Accellion performed a comprehensive evaluation of its FTA software in response to the December 2020 incident, it would have determined that there were four additional significant vulnerabilities in its FTA software.

31.     On Thursday December 17, 2020, Insured received notification regarding an "anomaly" with Accellion's FTA software. Insured promptly contacted Accellion after receiving this notification and thereafter followed up with Accellion. Despite knowledge of a critical vulnerability in the FTA and the exploitation of that vulnerability, Accellion did not report that critical vulnerability or its exploitation to Insured. Nor did it advise Insured to immediately take any action. Instead, on Friday, December 18, 2020, Accellion's CISO and Senior Vice President of Operations, Frank Balonis, informed Insured's Information Technology Manager, "We are doing further investigation on this issue and will update you as soon as we have more information" Mr. Balonis assured Insured that Accellion is "reviewing logs" regarding the alerts and "will update Monday morning with our findings."

32.     Despite Insured's numerous inquiries, Accellion did not alert Insured to the severity or urgency of the December exploitation until December 20, 2020, when Mr. Balonis informed Insured that "we've determined that there is a vulnerability that exists which allows unauthorized access to the [FTA]. The engineering team has found the issue which has been fixed and tested." Accellion reported that the vulnerability was so severe that Insured should shut down the FTA software it used until the update could be installed.

33.     Insured expressed concern about this information and followed up with Accellion. In response, Mr. Balonis, on behalf of Accellion, assured Insured, on or about December 20, 2020, that "[t]he [FTA] logs do not indicate any of your files were accessed" and only indicated "that the vulnerabilities were exploited on the [FTA] system". He further recommended that Insured "work with [Accellion's] support team to re-image the [FTA] system. Meaning we launch a new FTA system and move the data over to have full confidence there is no remaining backdoor left on the system."

34.     Based upon the information and assurances provided by Accellion, Insured allowed an Accellion representative to set up a new FTA service. Insured used the new FTA service, relying on assurances from Accellion that it had fully investigated vulnerabilities in the FTA software, identified the vulnerabilities, and that it had repaired those vulnerabilities. Based on Accellion's assurances, Insured reasonably believed that there were no outstanding vulnerabilities in the FTA software and no reason to suspect that additional vulnerabilities might exist.

35.     Accellion's representations to Insured were echoed in Accellion's press releases. On or about January 12, 2021, Accellion issued a press release acknowledging that it identified a vulnerability in its FTA software in December 2020. Accellion reported, "In mid-December, Accellion was made aware of a P0 vulnerability in its legacy File Transfer Appliance (FTA) software." Accellion's January 12, 2021 press release represented, "Accellion resolved the vulnerability and released a patch within 72 hours to the less than 50 customers affected."

**D.    THE JANUARY 2021 BREACH OF ACCELLION'S FTA SOFTWARE**

36.     On or about January 20, 2021, threat actors again breached the FTA software by exploiting unresolved vulnerabilities in the software.[4]

---

[4] *See* https://www.kiteworks.com/sites/default/files/trust-center/acclleion-fta-attack-mandiant-report-full.pdf (last visited Jan. 18, 2022).

37.     Days later, Accellion informed Insured via email that it had "discovered an active exploit" in its FTA software "that is an extension of the P0 vulnerability previously reported on 12/20/20. **We strongly encourage you to shut down your system immediately.**" Accellion reported that the vulnerability could affect its software, even with the previously provided patch installed. Insured immediately shut down the FTA software that was running on its systems. In order to determine the scope of the breach and whether any of Insured's information in transit with Accellion was vulnerable, Insured followed up continuously with Accellion, seeking more information and requesting assistance from Accellion.

38.     On January 26, 2021, Accellion directed Insured to apply a software patch to the FTA software. Insured did so. Insured then received an email stating to "contact Accellion support immediately!" Insured contacted Accellion and Accellion informed Insured that it needed a second or third tier Accellion technician to obtain more information. During Insured's repeated follow-up communications with Accellion, Accellion's representatives assured Insured that they were elevating its request for assistance within Accellion.

39.     Insured turned off the FTA software until January 29, 2021, when Accellion asked Insured to turn the software back on to allow Accellion to apply its keys to the portal to determine the scope of Insured's information that was potentially exposed and to determine whether any of Insured's information was actually exposed.

40.     On February 1, 2021, Accellion published a press release entitled "All Known Vulnerabilities Closed and Migration Efforts Continue."[5]  The February 1, 2021 press release again acknowledged, "In mid-December, Accellion was made aware of a zero-day vulnerability in its

---

[5] *See* https://www.kiteworks.com/company/security-updates/accellion-provides-update-to-recent-fta-security-incident/ (last visited Jan. 18, 2022).

9

legacy FTA software. Accellion released a fix within 72 hours."[6] The February 1, 2021 press release, however, acknowledged that the December vulnerabilities were not in fact resolved, and that the FTA cyberattack continued into January 2021: "This initial incident was the beginning of a concerted cyberattack on the Accellion FTA product that continued into January 2021. Accellion identified additional exploits in the ensuing weeks and rapidly developed and released patches to close each vulnerability." These patches did not protect confidential information as cyber criminals had already exploited the vulnerabilities.

41.     On February 11, 2021, Accellion informed Insured that it would go into its software and attempt to extract the keys encrypting Insured's files to determine which of Insureds' files remained within Accellion's software and were therefore potentially exposed by the security vulnerabilities. Insured was not able to access the information within Accellion's FTA software due to the design of Accellion's FTA software and instead was dependent on Accellion to extract this information from its software.

42.     On February 15, 2021, Accellion informed Insured that it could not extract the files as the threat actor had encrypted these in Accellion's software.

43.     Insured subsequently engaged its own experts, legal counsel, and other outside professionals to help it determine the scope and impact of the breach, and to determine its response to the breach.

E.     **ACCELLION'S OWN INVESTIGATION CONFIRMED NUMEROUS VULNERABILITIES IN ITS SOFTWARE AND THE EXPLOITATION OF THESE VULNERABILITIES**

44.     Accellion engaged Mandiant, Inc. ("Mandiant"), a cybersecurity firm, to conduct a security assessment of its FTA. On February 4, 2021, Mandiant began its security assessment,

---

[6] Although Accellion may have advised Insured of a vulnerability within this time frame, Accellion had not "fixed" the FTA software used by Insured within its recommendations in 72 hours, nor did Accellion "fix" all the existing vulnerabilities.

which identified two new vulnerabilities, and on February 28, 2021, Mandiant concluded its security assessment.

45.     On February 22, 2021, Mandiant issued an initial report titled, "Threat Research," reflecting Mandiant's investigation and analysis of vulnerabilities in Accellion's FTA. Mandiant's initial reporting concluded that "[s]tarting in mid-December 2020, malicious actors that Mandiant tracks as UNC2546 exploited multiple zero-day vulnerabilities in Accellion's legacy File Transfer Appliance (FTA) to install a newly discovered web shell named DEWMODE."

46.     On February 22, 2021, Accellion published a press release entitled, "Mandiant Identifies Criminal Threat Actor and Mode of Attacks." The February 22, 2021 press release attached a link to the initial February 22, 2021 "Threat Research" report issued by Mandiant.

47.     Per Mandiantt, the following chart reflects the "timeline of relevant events, starting with the first detection of anomalous activity" related to the exploit of FTA in December 2020:

| December Exploit | Exploit | • Dec. 16, 2020: | First known use of December Exploit: exploit trips FTA's built-in anomaly detector on customer's device |
| | Investigation | • Dec. 16, 2020: | Customer notifies Accellion that its anomaly detector was triggered |
| | Investigation | • Dec. 16-19, 2020: | Accellion investigates and identifies vulnerabilities affecting FTA 9.12.370 – SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104) |
| | Mitigation | • Dec. 20, 2020: | Accellion releases patch FTA 9.12.380, which remediates CVE-2021-27101 and CVE-2021-27104 |
| | Mitigation | • Dec. 23, 2020: | Accellion releases patch FTA 9.12.411, increasing anomaly detector checks from one per day to one per hour |

48.     Mandiant concluded that the vulnerability in Accellion's FTA was a "zero-day vulnerability." Per Mandiant, a "zero-day vulnerability, at its core, is a flaw" and "an unknown exploit in the wild that exposes a vulnerability in software or hardware and can create complicated problems well before anyone realizes something is wrong." Per Mandiant, a "zero-day exploit leaves NO opportunity for detection ... at first."

11

49.     Unlike Mandiant's definition of a "zero day vulnerability," Accellion knew of a vulnerability in the FTA and the exploitation of that vulnerability on December 16, 2020. Accellion did not, however, immediately report that vulnerability or its exploitation to its customers on December 16, 2020 and thereby denied its customers the opportunity to terminate use of FTA and protect themselves against a breach of Accellion's FTA software.

50.     Accellion, despite knowing of the December 2020 vulnerabilities and identifying its FTA software as "end-of-life" due in part to the software's age, did not test the software for additional vulnerabilities prior to advising its customers on December 20, 2020 that the vulnerability was resolved and that the software was again safe to use. According to the Mandiant Report, had Accellion performed such testing, it would have identified four additional significant vulnerabilities in its FTA software.

51.     After Accellion advised its customers that it "found the issue which has been fixed and tested," and that the FTA software was again safe to use, the threat actors exploited two of the four (or more) outstanding vulnerabilities in the FTA software. Per the Mandiant Report, the following chart reflects the "timeline of relevant events, starting with the first detection of anomalous activity" related to the second exploit of FTA in in January 2021:

| January Exploit | Exploit | • Jan. 20, 2021: | First known use of January Exploit (unknown to Accellion at the time) |
|---|---|---|---|
| | Exploit | • Jan. 22, 2021: | Through multiple customer service inquiries, Accellion learns of anomalous activity indicative of new exploit |
| | Mitigation | • Jan. 22, 2021: | Accellion issues critical security alert advising FTA customers to shut down their FTA systems immediately |
| | Mitigation | • Jan. 22-25, 2021: | Accellion investigates and identifies Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102) vulnerabilities |
| | Mitigation | • Jan. 25, 2021: | Accellion releases patch FTA 9.12.416, which remediates CVE-2021-27102 and CVE-2021-27103 |
| | Mitigation | • Jan. 28, 2021: | Accellion releases patch FTA_9.12.432, increasing frequency of anomaly detector checks to every 10 minutes |

12

52.     On March 1, 2021, Accellion released patches to address an additional two new critical vulnerabilities found by Mandiant, but not believed by Accellion to have been used by the threat actors.[7]

**F.     ACCELLION'S BREACH EXPOSED INSURED'S CONFIDENTIAL INFORMATION AND CAUSED DAMAGES**

53.     Prior to Accellion's March 1, 2021 patching of the additional vulnerabilities, threat actors stole protected health information and other confidential information from Insured. Threat actors demanded ransom from Insured in order to prevent the public disclosure of the Insured's confidential information. Insured refused to make any ransom payment, but incurred damages and costs to remediate the breach through its use of third party vendors. As a direct result of the Accellion data breach, Insured incurred approximately $1,066,507.52 in damages.

54.     Pursuant to the terms of Insured's insurance policy with ASIC, and an assignment, ASIC is contractually, legally and equitably subrogated, to Insured's rights against Accellion to recover for the amounts paid as a result of the loss, as well as to pursue any uninsured losses suffered by virtue of the assignment of such claims, if any. ASIC/Insured continue to incur losses due to the vulnerabilities in Accellion's software and Accellion's failure to timely acknowledge and remedy those vulnerabilities. ASIC seeks to, at a minimum, recover amounts paid on behalf of Insured, but reserves the right to seek reimbursement of all loss incurred by any insureds as a result of any vulnerabilities in Accellion's systems and Accellion's response thereto.

**COUNT I**
**(BREACH OF CONTRACT)**

55.     Plaintiff ASIC incorporates by reference each of its allegations in paragraphs 1 through 54 of this Second Amended Complaint.

---

[7] *See* https://www.kiteworks.com/sites/default/files/trust-center/acclleion-fta-attack-mandiant-report-full.pdf (last visited Jan. 18, 2022).

56. On August 23, 2018, Insured entered into the License Agreement with Accellion. Pursuant to the License Agreement, Insured obtained the "right[] to use Accellion software" and Accellion agreed to provide software-related services, maintenance, and support.

57. Under the Confidentiality Provision in Section 6.1 of the License Agreement, Accellion agreed "to maintain in confidence and not disclose any Confidential Information acquired directly or indirectly from" Insured. (License Agreement, § 6.1). The License Agreement provided that Confidential Information "shall include, but is not limited to, matters of a technical, financial, commercial, business, or other proprietary nature."

58. Once Insured sent its confidential information through Accellion's FTA software, Accellion (through its FTA) acquired those files as it encrypted the files and transmitted the files to recipients. Once uploaded, Accellion (through its FTA) held Insured's confidential information.

59. Once uploaded, Insured did not have access to and could not see which of its files were within Accellion's software while those files were in transit to their recipient. Accellion alone had the encryption keys and document logs, and Accellion (through its FTA) exercised complete control over the final recipients' accounts and their access to Insured's files.

60. After Accellion acquired Insured's confidential information, threat actors exploited vulnerabilities in Accellion's FTA software through the January 2021 breach and accessed Insured's confidential information. Following the breach, Insured received a ransom demand from threat actors relating to Insured's confidential information.

61. Accepting these allegations as true, Accellion breached the Confidentiality Provision of the License Agreement by failing to maintain in confidence Insured's confidential information that it acquired from Insured through the Insured's use of the FTA software. Accellion failed to maintain such information in confidence as evidenced by the fact that Insured's

information was accessed by threat actors as a result of the 2021 breach. Therefore, Accellion breached its contractual obligation to maintain the confidentiality of Insured's information.

62.     As a direct result of Accellion's breach of contract, Insured's confidential information, including protected health information, was accessed by threat actors. Insured incurred damages and loss in the amount of approximately $1,066,507.52 as a direct result of Accellion's breach of the Confidentiality Provision of the License Agreement.

WHEREFORE, Plaintiff ASIC requests that a judgment be entered against Accellion in an amount in excess of $1,066,507.52, an award of interest, attorney's fees, costs and other damages incurred by Insured, and for such other or further relief as the Court deems equitable and just.

## COUNT II
## (NEGLIGENT MISREPRESENTATION/OMISSION)

63.     ASIC incorporates by reference each of its allegations in paragraphs 1 through 54 of this Second Amended Complaint.

64.     The FTA software was owned by and belonged to Accellion, which determined when updates were necessary, distributed updates, and helped install those updates. Insured only obtained a license to use the software, and it was dependent on Accellion to provide information and Maintenance Support Services.

65.     Accellion, as the owner and maintainer of the FTA software, had superior knowledge regarding the security of the FTA and assumed a special duty to inform Insured about the vulnerabilities and other security issues with the FTA software.  Therefore, absent the License Agreement, Accellion had a common law duty to exercise reasonable care to ensure that its FTA software was secure and to make accurate and complete statements to Insured regarding the security of its FTA software.

66.     Accellion made numerous false statements and/or omissions to Insured prior to the

15

breaches of its FTA software and during those breaches.

67.     First, when offering its FTA software to Insured on August 23, 2018, Accellion represented that its software will be free from any viruses, spyware, trojans, or disabling or malicious code. Accellion intended for Insured to rely on this representation regarding the software when purchasing its license to use the software and in deciding to use the software. This statement was misleading as, upon information and belief based on Mandiant's report of the nature of the vulnerabilities, at the time Accellion made these representations, Accellion's FTA software contained four critical vulnerabilities (namely the SQL Injection (CVE-2021-27101), OS Command Execution (CVE-2021-27104), Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102)). Each of these critical vulnerabilities were disabling code as they were exploited by the threat actor and used to disable the security of the FTA software. Insured would not have purchased a license for or used Accellion's FTA software if it knew that the software contained vulnerabilities that could be exploited by a threat actor.

68.     Secondly, Accellion obtained a NIST FIPS 140-2 certification for the FTA and publicized its FTA software as FIPS 140-2 compliant. NIST required software labeled as compliant with FIPS 140-2 to not only comply with the FIPS 140-2 model at the time of certification, but to continue to use the cryptographic model throughout its life-cycle. Accellion advertised its FTA software as FIPS 140-2 compliant, knowing the product was twenty years old and despite its concerns about the product's vulnerabilities, as evidenced by its decision to transition its customers to its newer Kiteworks solution. Specifically, Accellion issued undated alerts prior to December 2020, including one advising licensees that its FTA software "has achieved FIPS 140 Level 2 certification … This certifies that all file transfer operations through the [FTA] are being performed in a highly secure and safe environment." These alerts were

16

publicly available and were reviewed and relied upon by Insured at all times relevant to this complaint. Upon information and belief based on Mandiant's report of the nature of the vulnerabilities, Accellion's FTA did not comply with FIPS 140-2 at the time Accellion provided Insured a license for the FTA or at any point thereafter because it contained four critical vulnerabilities (SQL Injection (CVE-2021-27101), OS Command Execution (CVE-2021-27104), Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102)), which could be, and were in fact, exploited by threat actors in order to obtain access to confidential information transmitted through the FTA.

69.     Accellion intended for Insured to rely on its representation regarding the FTA software's FIPS 140-2 compliance when purchasing its license to use the software and in deciding to use the software.

70.     Insured relied on Accellion's representations regarding its FIPS 140-2 compliance in determining the appropriate scope of use for the product and in determining that it could use Accellion's FTA to transfer certain sensitive and protected information. Specifically, prior to transferring sensitive information, Insureds' divisions asked Insured's information technology team how they could transmit certain categories of sensitive information. After reviewing Accellion's publications to confirm that Accellion was compliant with the FIPS 140-2 standards, Insured's information technology team informed the inquiring divisions that the FTA software was an acceptable means of transferring sensitive information. Insured's information technology team relied on Accellion's continued representations of its software as FIPS 140-2 compliant in allowing its divisions to continue to use the FTA software to transmit sensitive information.

71.     Although Accellion's FTA software was vulnerable to exploitation and compromise, and was no longer compliant with FIPS 140-2,  Accellion continued to hold its FTA

software out to its customers as FIPS 140-2 compliant, and did not at any time relevant to this action, advise Insured that the FTA software was not in fact compliant with FIPS 140-2 security requirements. Had Accellion not informed Insured that its FTA software was FIPS 140-2-compliant or informed Insured that its FTA software was no longer FIPS 140-2 compliant, Insured would not have used the software to transmit its confidential information, or would have restricted the information that it transmitted in Accellion's FTA software.

72.     Third, Accellion knew of a critical vulnerability in the FTA software and the exploitation of that vulnerability on December 16, 2020. Despite Insured's inquiry as to an alert regarding an "anomaly" on Thursday December 17, 2020, Accellion did not inform Insured of the critical vulnerability or the exploitation of that vulnerability, nor did Accellion advise Insured to immediately take any action. Instead, in violation of its Maintenance Support Policy to "resolve the critical error and/or provide a work around within forty-eight (48) hours", Accellion's CISO and Senior Vice President of Operations, Frank Balonis, informed Insured's Information Technology Manager, "We are doing further investigation on this issue and will update you as soon as we have more information." Mr. Balonis assured Insured that Accellion is "reviewing logs" regarding the alerts and "will update Monday morning with our findings."

73.     Accellion did not alert Insured to the severity or urgency of the December exploitation until four days after Accellion began investigating the critical vulnerability. On Sunday, December 20, 2020, Mr. Balonis informed Insured, "[W]e've determined that there is a vulnerability that exists which allows unauthorized access to the [FTA]. The engineering team has found the issue which has been fixed and tested." Mr. Balonis' statement, on behalf of Accellion, omitted the crucial information that during its four-day investigation, Accellion had not investigated the extent to which there could be additional vulnerabilities. This omission exposed

Insured to significant risk as Accellion's software had additional critical vulnerabilities, and neither Accellion's engineers nor any forensic investigators had resolved those vulnerabilities. Mr. Balonis and Accellion also failed to inform Insured that Accellion viewed the FTA software as "end-of-life" and that it was phasing out the software in favor of its Kiteworks solution. Accellion's misrepresentations and omissions falsely conveyed to Insured that Accellion had performed a full investigation as to the security of the FTA on a go-forward basis; that the FTA had a single non-critical vulnerability, which Accellion had "fixed and tested"; and that there was no reason to suspect that the FTA had additional critical vulnerabilities that the threat actor could exploit. This was not true as the FTA did not have a singular vulnerability, but rather had four critical vulnerabilities and two additional significant vulnerabilities at the time that Accellion made this misrepresentation.

74.     Instead of disclosing the additional vulnerabilities and Accellion's failure to fully identify all vulnerabilities, Mr. Balonis, on behalf of Accellion, assured Insured, on or about December 20, 2020, that "[t]he [FTA] logs do not indicate any of your files were accessed" and only indicated "that the vulnerabilities were exploited on the [FTA] system". He further recommended that Insured "work with [Accellion's] support team to re-image the [FTA] system. Meaning we launch a new FTA system and move the data over to have full confidence there is no remaining backdoor left on the system." These statements were misrepresentations as Accellion did not and could not have "full confidence there [wa]s no remaining backdoor left on the FTA" as it had not performed an investigation into whether there were additional critical vulnerabilities that the threat actor could exploit., and as Mandiant determined, there were four critical vulnerabilities and two significant vulnerabilities in the FTA software at the time Accellion made this representation.  At the time Mr. Balonis made these representations on behalf of Accellion,

he/Accellion intended for Insured to rely on these statements in deciding to continue to use Accellion's FTA software on a go-forward basis.

75.     Based upon the information and assurances provided by Mr. Balonis on behalf of Accellion, Insured allowed an Accellion representative to set up a new FTA service. Insured used the new FTA service, relying on the assurances from Mr. Balonis that Accellion had performed a full investigation into vulnerabilities in its FTA software, identified the existing vulnerabilities, and fixed those vulnerabilities.

76.     Accellion's press releases echoed this information Mr. Balonis provided Insured. On January 11, 2021, Accellion issued a press release that stated, "In mid-December, Accellion was made aware of a P0 vulnerability in its legacy File Transfer Appliance (FTA) software." The press release continued, "Accellion resolved the vulnerability and released a patch within 72 hours to the less than 50 customers affected." This press release omitted key information as it did not advise that Accellion viewed the FTA as an end-of-life software or that Accellion had not investigated the extent to which there could be additional vulnerabilities in the FTA. The press release also provided the false impression that licensees could be confident that the software was secure on a go-forward basis.

77.     Mr. Balonis' statements and Accellion's press releases were false and misleading to Insured as the statements indicated that Accellion had performed a full investigation of  the security of the FTA software over the course of several days. These statements and press releases also conveyed that Accellion had determined that if Insured took the recommended steps of re-imaging the FTA system, that there were no further ascertainable vulnerabilities that could impact the security of Insured's data. At the time Mr. Balonis made these statements on behalf of Accellion, he/Accellion knew or should have known that this was not the case as the FTA was an

"end-of-life" product, and Accellion had not investigated whether there were other vulnerabilities with the software. Indeed, if Accellion had conducted such an investigation, it would have identified at least four additional vulnerabilities (as Mandiant found in its investigation) and advised Insured not to resume use of the FTA while those vulnerabilities could be exploited.

78.     As further detailed above, prior to the January 2021 breach, Accellion never advised Insured that: (1) the FTA software was "end-of-life"; (2) that the FTA software was no longer FIPS 140-2 compliant; (3) Accellion had not conducted a full investigation to identify all vulnerabilities; (4) that there were potential additional vulnerabilities besides those patched in December 2020; or (5) Accellion had not searched for such vulnerabilities prior to advising Insured that the FTA was secure .

79.     In reliance on Accellion's statements regarding the FTA software, including its FIPS 140-2 compliance, the resolution of the vulnerabilities identified in December 2020, and the security of the FTA on a go-forward basis, and Accellion's omission of the above-referenced material facts, Insured continued to use the FTA software to transfer its confidential information and files in January 2021.

80.     As a result of Insured's reliance, Accellion continued to collect fees and/or retained previously collected fees for Insured's license of the FTA software.

81.     Accepting Insured's allegations as true, Accellion breached its common law duty to exercise reasonable care and to make accurate and complete statements to Insured regarding the security of its FTA software and thus, is liable for Insured's loss.

82.     As a direct and proximate result of Accellion's representations and omissions, and Insured's reasonable reliance thereon, Insured incurred damages and loss in the amount of approximately $1,066,507.52.

WHEREFORE, Plaintiff ASIC requests that a judgment be entered against Accellion in an amount in excess of $1,066,507.52, an award of interest, attorney's fees, costs and other damages incurred by Insured, and for such other or further relief as the Court deems equitable and just.

## COUNT III
## (FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.204)

83.     ASIC incorporates by reference each of its allegations in paragraphs 1 through 54 of this Second Amended Complaint.

84.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…" § 501.204(1), Fla. Stat. (2016).

85.     Accellion provided software products to Florida customers thereby engaging in "trade or commerce" as defined in § 501.203(8), Fla. Stat. (2016).

86.     Insured constitutes a "consumer" under § 501.203(7), Fla. Stat. (2016).

87.     Accellion's deceptive and unfair practices included, but were not limited to: (1) misrepresenting the scope of the FTA security breach; (2) misrepresenting that its FTA software was secure following the December exploit of the FTA's vulnerabilities; and (3) failing to provide adequate security instructions and measures to Accellion customers in order to properly protect their confidential information following the December 2020 exploit of the FTA vulnerabilities.

88.     Accellion's actions constitute unfair and deceptive trade practices that are expressly prohibited by § 501.204(1), *et seq*.

89.     As a direct and proximate cause of Accellion's unfair and deceptive trade practices, Insured suffered actual damages, including the amount it paid for its license for Accellion's FTA software, which was, at all times relevant to this complaint, valueless as the FTA was not secure and did not offer the security that Accellion represented that it did, including compliance with

FIPS 140-2. On behalf of the Insured, ASIC is also entitled to its attorneys' fees and costs for having to bring this action for deceptive trade practices under the applicable Florida statute.

WHEREFORE, Plaintiff requests that a judgment be entered against Accellion for its damages in an amount to be proved at trial, an award of interest, attorney's fees, costs and other damages incurred by Insured, and for such other or further relief as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

Dated:   November 3, 2022

Respectfully submitted,

**GORDON REES SCULLY MANSUKHANI**

By:   */s/Chantel C. Wonder*
Chantel C. Wonder
Florida Bar No.: 0087601
cwonder@grsm.com
Miami Tower
100 SE Second Street, Suite 3900
Miami, FL 33131
Tel:  (Direct) 305-428-5309
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 3, 2022, I electronically filed the forgoing with the Clerk of Court using CM/ECF, through which the document will be served on all counsel of record through transmission of Notices of Electronic Filing generated by CM/ECF.

By:   */s/Chantel C. Wonder*
Chantel C. Wonder
Florida Bar No.: 0087601
cwonder@grsm.com
Miami Tower
100 SE Second Street, Suite 3900
Miami, FL 33131
Tel:  (Direct) 305-428-5309
*Counsel for Plaintiff*